**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| JULIO CESAR SANCHEZ PUENTES *and* LUDDIS NORELIA SANCHEZ GARCIA<br><br>*Petitioners*,<br><br>v.<br><br>ANGEL GARITE, *in his official capacity as Assistant Field Office Director of the U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations El Paso Field Office*; MARY DE ANDA-YBARRA, *in her official capacity as Field Office Director of the U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations El Paso Field Office*; TODD LYONS, *in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement*; KRISTI NOEM, *in her official capacity as Secretary of the Department of Homeland Security; and* PAM BONDI, *in her official capacity as Attorney General of the United States*,<br><br>*Respondents*. | **AMENDED VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND REQUEST FOR ORDER TO SHOW CAUSE**<br><br>Case No. 25-cv-0127 |

## INTRODUCTION

1.     On April 16, 2025, Petitioners Julio Cesar Sanchez Puentes (Mr. Sanchez) and Luddis Norelia Sanchez Garcia (Ms. Sanchez) (Petitioners) were detained at the El Paso International Airport after three judges across the United States had already found that they should not be detained.

1

2.    Mr. and Ms. Sanchez fled Venezuela in 2022, were paroled into the United States, and were granted Temporary Protected Status (TPS), which continues to protect them from detention and deportation. Yet, Immigration and Customs Enforcement (ICE) took Petitioners into its custody on April 16, 2025. Their detention in ICE custody is patently unlawful and this Court should release them immediately.

3.    The TPS statute unequivocally states that "[a] [non-citizen] provided temporary protected status under this section *shall not be detained* by the Attorney General on the basis of the alien's immigration status in the United States." 8 U.S.C. § 1254a(d)(4) (emphasis added). Although Petitioners' TPS was withdrawn on April 1, 2025, they were given thirty-three days to appeal, until May 4, 2025. *See* Dkt. 1-1, TPS Withdrawal Notices. Mr. and Ms. Sanchez are still well within the time period to file an appeal and have recently secured counsel to prepare that appeal. 8 C.F.R. § 244.14(b)(3) provides that "Temporary Protected Status benefits will be extended during the pendency of an appeal." Such benefits include the statutory prohibition on detention. Accordingly, Mr. and Ms. Sanchez remain protected from detention on the basis of their immigration status.

4.    Respondents' initial detention of Petitioners thus violates the Immigration and Nationality Act (INA) and the regulations implementing it, as well as the Due Process Clause of the Fifth Amendment.

5.    Upon information and belief, several hours after they were unlawfully detained, Respondents designated them as alien enemies under the Alien Enemies Act (AEA or the Act), 50 U.S.C. §§ 21-24, pursuant to the Presidential Proclamation, "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua." Proclamation No. 10903, 90 Fed. Reg. 13033 (Mar. 14, 2025).[1]

_____

[1] Undersigned counsel had not yet learned of the alien enemies designation when the Habeas

6.     On March 15, 2025, President Trump publicly issued the Proclamation.[2] The Proclamation invoked the AEA against Venezuelan citizens who are 14 years of age or older whom the administration accuses (regardless of the actual circumstances or facts) of being members of the transnational criminal organization known as Tren de Aragua. 90 Fed. Reg. at 13034 (providing that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."). While at that point, the basis of Mr. and Ms. Sanchez's detention changed, it did not cure the unlawfulness of their initial detention. Their continuing detention is also unlawful.

7.     Respondents' designation of Mr. Sanchez and Ms. Sanchez as alien enemies is baseless and grounded in allegations about Tren de Aragua association which another United States District Court has already considered and rejected as entirely without merit. *See generally* Dkt. 1-8, Tr. of March 28, 2025 Hr'g.

8.     The detention of Petitioners under the Alien Enemies Act has violated and continues to violate their right to due process. *See* 28 U.S.C. § 2241; U.S. Const. art. I, § 9, cl. 2 (Suspension Clause). Accordingly, Petitioners seek an adjudication from this Court that their designation as alien enemies is unlawful and that they should be released immediately.

---

Petition, Dkt. 1, was filed, but alerted the court to the alien enemies designation in Petitioners' Emergency Motion for Temporary Restraining Order.

[2] *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua*, The White House (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction under Art. I § 9, cl. 2 of the U.S. Constitution ("the Suspension Clause"), 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 2201 (Declaratory Judgment Act).

10.      Federal district courts have jurisdiction to hear habeas claims by noncitizens challenging the lawfulness of their detention. *See*, *e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). The district of confinement also has jurisdiction to hear claims regarding the invocation of the AEA and designation of individuals as alien enemies. *See J.G.G. v. Trump*, 604 U.S. __, 2025 WL 1024097, at *2 (2025) (per curiam) ("[A]n individual subject to detention and removal under the [AEA] is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'").

11.      Venue is proper in this district and division pursuant to 28 U.S.C. §§ 2241(c)(3) and 1391(b)(2) and (e)(1) because Petitioners are currently detained in this district at the El Paso Service Processing Center, and events or omissions giving rise to this action occurred in this district.

## PARTIES

12.      Petitioners Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia are natives and citizens of Venezuela who are currently in the custody of the El Paso ICE Field Office in El Paso, Texas.

13.      Respondent Angel Garite is the Assistant Field Office Director for the El Paso Field Office. Angel Garite performs the duties typically performed by a warden for the El Paso

Service Processing Center. Accordingly, Angel Garite is the legal custodian of Petitioner and is named in his official capacity.

14.    Respondent Mary de Anda-Ybarra is the Field Office Director for the El Paso ICE Field Office. In that capacity, she is charged with overseeing all ICE detention centers and holding facilities in the El Paso ICE Field Office area of responsibility and has the authority to make custody determinations regarding individuals detained there. Respondent de Anda-Ybarra is an immediate and legal custodian of Petitioners and is sued in her official capacity.

15.    Respondent Todd Lyons is the Acting Director of U.S. Immigration and Customs Enforcement (ICE). He is the immediate custodian of Mr. and Ms. Sanchez and is sued in his official capacity.

16.    Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland Security (DHS). She supervises ICE, an agency within DHS that is responsible for the administration and enforcement of immigration laws and has supervisory responsibility for and authority over the detention and removal of noncitizens throughout the United States. Secretary Noem is the ultimate legal custodian of Petitioners. Respondent Noem is sued in her official capacity.

17.    Respondent Pam Bondi is the Attorney General of the United States. As the Attorney General, she oversees the Executive Office for Immigration Review (EOIR), including all Immigration Judges. Respondent Bondi is sued in her official capacity.

## LEGAL BACKGROUND

***Temporary Protected Status***

18.    Venezuelans living in the United States first received temporary protection from removal on January 19, 2021, when President Trump—on the last day of his first

Administration—directed the Secretaries of State and Homeland Security to "take appropriate measures to defer for 18 months the removal of any national of Venezuela . . . who is present in the United States as of January 20, 2021," with limited exceptions. Memorandum re Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845 (Jan. 19, 2021).

19.    DHS then designated TPS for Venezuela on March 9, 2021, based on the Secretary's determination that "extraordinary and temporary conditions in the foreign state prevent [Venezuelans] from returning in safety" and that "permitting [Venezuelans] to remain temporarily in the United States" is not "contrary to the national interests of the United States." 86 Fed. Reg. 13574 at 13575. The Secretary found that "Venezuela is currently facing a severe humanitarian emergency" and "has been in the midst of a severe political and economic crisis for several years . . . marked by a wide range of factors including: Economic contraction; inflation and hyperinflation; deepening poverty; high levels of unemployment; reduced access to and shortages of food and medicine; a severely weakened medical system; the reappearance or increased incidence of certain communicable diseases; a collapse in basic services; water, electricity, and fuel shortages; political polarization; institutional and political tensions; human rights abuses and repression; crime and violence; corruption; increased human mobility and displacement (including internal migration, emigration, and return); and the impact of the COVID-19 pandemic, among other factors." *Id.* at 13576.

20.    DHS extended and broadened TPS protection for Venezuelans twice after that initial designation. DHS extended Venezuela's TPS designation for 18 months on September 8, 2022, through March 10, 2024. 87 Fed. Reg. 55024. DHS again extended the 2021 designation of Venezuela for 18 months on October 3, 2023. At that time DHS also re-designated Venezuela for TPS for 18 months, allowing individuals who had come to the United States after March

2021 to become eligible for TPS. 88 Fed. Reg. 68130 ("2023 Venezuela Designation"). The extension of the 2021 designation ran from March 11, 2024 through September 10, 2025. The new 2023 re-designation ran from October 3, 2023 through April 2, 2025. Finally, on January 17, 2025, the DHS Secretary extended the 2023 Venezuela Designation by 18 months, through October 2, 2026. 90 Fed. Reg. 5961 ("January 2025 Extension").

21.   In support of that extension, the DHS Secretary found that "Venezuela is experiencing a complex, serious and multidimensional humanitarian crisis. The crisis has reportedly disrupted every aspect of life in Venezuela. Basic services like electricity, internet access, and water are patchy; malnutrition is on the rise; the healthcare system has collapsed; and children receive poor or no education. Inflation rates are also among the highest in the world. Venezuela's complex crisis has pushed Venezuelans into poverty, hunger, poor health, crime, desperation and migration. Moreover, Nicolas Maduro's declaration of victory in the July 28, 2024 presidential election—which has been contested as fraudulent by the opposition—has been followed by yet another sweeping crackdown on dissent." *Id.* at 5963 (internal quotation marks and citations omitted).

22.   After entering office, the Trump administration reversed course on TPS for Venezuela. On January 28, 2025, the new DHS Secretary purported to "vacate" the January 2025 Extension of TPS for Venezuela.[3] That decision was the first vacatur of a TPS extension in the 35-year history of the TPS statute. DHS published it via notice in the Federal Register on February 3, 2025. 90 Fed. Reg. 8805.

---

[3] USCIS, *Temporary Protected Status Designated Country: Venezuela*, *available at* https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela.

23.     On February 1, 2025, the new Secretary "decided to terminate" the 2023 Venezuela Designation, ordering an end to the legal status of approximately 350,000 Venezuelans, effective on April 7, 2025.[4]

24.     On February 5, 2025, DHS published a notice in the Federal Register purporting to terminate the 2023 Venezuela Designation. 90 Fed. Reg. 9040.

25.     On February 19, 2025, the National TPS Alliance and seven individual Venezuelan TPS holders sued the federal government, alleging that the vacatur and subsequent termination of TPS for Venezuela were contrary to the TPS statute in violation of the Administrative Procedure Act and unlawful under the Fifth Amendment. Plaintiffs moved to stay the recent vacatur and termination. The district court granted that motion, *National TPS Alliance v. Noem*, No. 3:25 CV 01766, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025), and the Government appealed to the Ninth Circuit, *National TPS Alliance, et al. v. Noem, et al.*, No. 25-2120 (9th Cir). That appeal is pending.

***Alien Enemies Act***

26.     The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.  The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and

---

[4] USCIS, *Temporary Protected Status Designated Country: Venezuela*, *available at* https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-venezuela.

upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21.

27.    The AEA can thus be triggered in only two situations. The first is when a formal declared war exists with a foreign nation or government. The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

28.    The Act has been used only three times in American history, all during actual or imminent wartime. The Act has never been invoked outside of war and applies only to warlike actions: it cannot be used here against nationals of a country—Venezuela—with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

29.    On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[5]

30.    The Proclamation characterizes Tren de Aragua as a hybrid criminal state engaged in an invasion and predatory incursion into the United States as a basis to invoke the AEA. It also characterizes Tren de Aragua, a criminal organization, as a foreign nation or government,

---

[5] *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua*, The White House (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/invocation-of-the-alien-enemies-act-regarding-the-invasion-of-the-united-states-by-tren-de-aragua/.

and does not name Venezuela itself as the "foreign government" as the target of the AEA invocation.

31.    The Proclamation states that all Venezuelan citizens ages fourteen or older alleged to be "members" of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies. The Proclamation itself provides no means or process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation.

32.    Noncitizens subject to the Proclamation are not afforded credible fear interviews for asylum, nor will claims for protection under the Convention Against Torture ("CAT") be recognized. The Proclamation therefore also violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens. *See* 8 U.S.C. § 1158(a)(1) (asylum);  8 U.S.C. § 1231(b)(3) (withholding of removal); 8 U.S.C. § 1231 note (Convention Against Torture, implementing the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242).

33.    Pursuant to the Proclamation, on March 15, the government deported at least 137 noncitizens to a brutal prison in El Salvador, without any review of any aspect of the determination that they are alien enemies.[6]

34.    The Supreme Court has held that due process requires that noncitizens apparently designated alien enemies must be provided with notice of the designation, notice which "must be afforded within a reasonable time and in such a manner as will allow them to actually seek

---

[6] *See* Marianne LeVine, Maria Sacchetti, Joyce Sohyun Lee & Natalie Allison, *White House official says 137 immigrants deported under Alien Enemies Act*, The Washington Post (Mar. 16, 2025), https://www.washingtonpost.com/immigration/2025/03/16/alien-enemies-act-venezuela-el-salvador-prison/; *see also Statement from the Press Secretary*, The White House (Mar. 16, 2025), https://www.whitehouse.gov/briefings-statements/2025/03/statement-from-the-press-secretary-50c7/.

habeas relief in the proper venue before such removal occurs." *J.G.G.*, 2025 WL 1024097, at *2; see also id ("[A]n individual subject to detention and removal under the [AEA] is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'") (citing *Ludecke v. Watkins*, 335 U.S. 160, 163-64, 172, n.17 (1948)).

## STATEMENT OF FACTS

35.    Luddis Norelia Sanchez Garcia (Ms. Sanchez) was born in Venezuela in 1991. Julio Cesar Sanchez Puentes (Mr. Sanchez) was born in Venezuela in 1997.

36.    The couple entered the United States together in October 2022 and were processed by immigration officials. As was customary practice at the time, U.S. Customs and Border Protection (CBP) paroled them into the United States. Dkt. 1-2, Parole Paperwork.

37.    Mr. and Ms. Sanchez traveled to and settled in the Washington D.C. area. They lived for a few months at a hotel in Northeast D.C., then moved into their own place in Maryland at the beginning of 2023. They later moved into a new place in D.C., where they currently reside with their three children.

38.    In February and March 2024, respectively, Mr. and Ms. Sanchez applied for TPS through the U.S. Citizenship and Immigration Service (USCIS). On May 7, 2024, Ms. Sanchez received a notice from USCIS granting her TPS status. Dkt 1-3, TPS Approvals. Mr. Sanchez received the same approval notice granting him TPS status on August 1, 2024. *Id.* Currently, because of the district court's order in *National TPS Alliance v. Noem*, No. 3:25 CV 01766, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025), Mr. and Ms. Sanchez's TPS is valid through September 10, 2025, and can be extended until October 2, 2026.

39.    Mr. and Ms. Sanchez additionally applied for asylum and withholding of removal under the Convention Against Torture with USCIS. Mr. Sanchez submitted his application on March 6, 2025, and Ms. Sanchez submitted her application on March 8, 2025.[7]

40.    On March 10, 2025, Mr. and Ms. Sanchez were arrested in Washington, Washington, D..C.. on criminal warrants from the Western District of Texas, alleging both with violating 8 § U.S.C. 1325(a)(1), a misdemeanor offense which criminalizes unlawful entry into the United States. Dkt. 1-4, Misdemeanor Arrest Warrants. At that point, Mr. and Ms. Sanchez had not been in Texas since October 2022, when they had presented themselves to and been paroled into the United States by a CBP agent. Though the alleged date of offense is October 13, 2022, the criminal warrant was not filed until February 27, 2025.

41.    On March 12, 2025, Magistrate Judge G. Michael Harvey of the U.S. District Court for the District of Columbia ordered both Mr. and Ms. Sanchez be released from custody pending the criminal trial. *See* Dkt. 1-5, DC Dockets. Despite Magistrate Judge Harvey's order to release Mr. and Ms. Sanchez from criminal custody, and Washington, Washington, D.C. policy limiting D.C. law enforcement's cooperation with immigration enforcement, U.S. Marshals continued detaining Mr. and Ms. Sanchez.

42.    In the early hours of March 13, 2025, the U.S. Marshals took Mr. and Ms. Sanchez from criminal custody to the courthouse and then placed them directly in ICE custody. ICE officers took Mr. and Ms. Sanchez to the Washington, D.C. ICE field office in Chantilly, Virginia, where they continued detaining the couple. ICE released the couple from detention that same day, on or around 3 pm. When they were released, Mr. and Ms. Sanchez were told to report for a check-in at the field office on April 29, 2025.

---

[7] Counsel has not included here Petitioners' asylum applications because of their highly confidential nature. Counsel will file the applications under seal if the Court requires the applications.

43. Since their release, Mr. and Ms. Sanchez regularly checked in with the Washington, D.C. Pretrial Services, as was required by the conditions of their release from criminal custody.

44. On March 21, 2025, Mr. and Ms. Sanchez were driving with their children when they were stopped by masked agents. The agents arrested Mr. and Ms. Sanchez and brought them into ICE custody. Mr. and Ms. Sanchez were once again held at the Washington, D.C. ICE field office in Chantilly, Virginia—only a week after their first unlawful detention at the same location. They were processed and served with Notices to Appear (NTAs), initiating immigration removal proceedings. Dkt. 1-6 NTAs. They were then both transferred: Mr. Sanchez to the Farmville Detention Center and Ms. Sanchez to the Caroline Detention Facility, both in Virginia.

45. That same day, Mr. and Ms. Sanchez filed a habeas petition in the U.S. District Court for the Eastern District of Virginia, arguing that, as TPS holders, their detention was unlawful because of the statutory bar to detention in 8 U.S.C. § 1254a(d)(4). *Sanchez Puentes v. Charles*, No. 1:25-cv-00509 (E.D. Va, filed Mar. 21 2025). Following briefing and a hearing on March 28, 2025, U.S. District Judge Leonie Brinkema released them from custody. Dkt. 1-7 Order; Dkt. 1-8 Tr. of March 28, 2025 Hr'g.

46. On April 1, 2025, DHS withdrew TPS from both Mr. and Ms. Sanchez. Dkt. 1-1. The letters notifying them of that withdrawal clearly indicate that they have thirty-three (33) days to file an appeal of the withdrawal decision, until May 4, 2025. *Id.* Mr. and Ms. Sanchez have every intention of appealing DHS TPS withdrawal decisions and have recently secured counsel from the immigration firm of Grossman Young & Hammond in Maryland to do so. Ex. 1, Sanchinelli Decl.   2.

47.    That same day, April 1, 2025, the Government represented to Mr. and Ms. Sanchez's counsel in the Eastern District of Virginia habeas action that,

> Because withdrawal of Petitioners' TPS status was not on a removability ground, they retain their TPS status pending administrative appeal pursuant to 8 C.F.R. 244.14(b)(3). Barring a successful government appeal in *National TPS Alliance v. Noem*, No. 3:25 CV 01766 (N.D. Cal.), resulting in vacatur of the TPS designation for Venezuela, or any developments bearing on Petitioners' TPS eligibility vis-à-vis their removability, therefore, we agree that Petitioners would maintain their TPS designation until any administrative appeals of the withdrawal are resolved.

> As for future detention, ICE will abide by Judge Brinkema's ruling that Petitioners may not be detained based on the present circumstances. Should those circumstances materially change, however, ICE may revisit whether detention is appropriate.

Dkt. 1-9, April 1, 2025 Email from Matthew Mezger.

48.    Mr. and Ms. Sanchez traveled to El Paso for a pretrial hearing in their misdemeanor criminal case on April 14, 2025. They appeared with counsel Sherilyn Bunn before U.S. Magistrate Judge Anne T. Berton on that day. Judge Berton maintained their release on bail and set a subsequent pretrial conference for June 23, 2025. Dkt. 1-10, W.D. Tex. Dockets.

49.    While they were attempting to return to their home in Washington, D.C. on April 16, 2025, Mr. and Ms. Sanchez were taken into custody by ICE in the El Paso International Airport. On information and belief, the agents who detained them stated that they did so because they had not yet appealed the withdrawal of their Temporary Protected Status, even though they were and still are well within the 33-day period provided for appeal. On information and belief, while in Respondents' custody that afternoon, Mr. and Ms. Sanchez were repeatedly interrogated, pressured to sign documents and to make admissions regarding issues intertwined with both their criminal and immigration cases, but without counsel present, despite the fact that they have retained both immigration counsel and criminal defense counsel and that counsel for

Petitioners were repeatedly contacting Respondents to obtain information about Petitioners' situation. The initial habeas petition followed. Dkt. 1.

50.    Counsel for Petitioners made multiple outreaches throughout the course of the day to determine Mr. and Ms. Sanchez's location and the basis for their detention. That outreach began immediately after Mr. and Ms. Sanchez were re-detained. They did not receive a substantive response until much later in the day.

51.    On information and belief, hours after their original detention and despite the lack of evidence of any association with Tren de Aragua, much less membership, Respondents designated them as alien enemies.

52.    On information and belief, Mr. and Ms. Sanchez were provided with a document in English (a language neither of them reads, speaks, or understands) as "notice" of their designation. That notice was entirely deficient and did not provide any meaningful opportunity to contest their designation. Nor did it provide sufficient time to challenge their designation.

53.    Counsel for Mr. and Ms. Sanchez were not provided with a copy of the notice or with any information about their earliest removal date, despite repeated requests and the centrality of the notice's designation to this petition. *See, e.g.*, Ex. 1, Sanchinelli Decl.    11. On information and belief, the notice does not state that it is possible to contest designation under the AEA or how to do so; does not state a timeframe for when removal will occur; and does not state that counsel will be notified.

54.    After making an urgent request for a legal visit at El Paso Service Processing Center, immigration counsel for Mr. and Ms. Sanchez was falsely told that Mr. and Ms. Sanchez were not at that facility. *Id.*    8.

55. Subsequently, the location of Petitioners was confirmed because a friend went to the El Paso Service Processing Center and was able to visit Ms. Sanchez. *Id.* 9.

56. Mr. and Ms. Sanchez's immigration counsel made multiple requests for urgent legal visits, but were only able to get a meeting scheduled with Mr. Sanchez for later tonight, April 18, and with Ms. Sanchez tomorrow, April 19—more than two and three days, respectively, from the time counsel initially requested an urgent legal visit with their clients. *Id.* ¶¶ 4, 8, 10.

### ARGUMENT

57. The Court need only look only to the TPS statute and regulations to resolve the legality of Petitioners' initial detention. The TPS statute unambiguously provides that "[a]n alien provided temporary protected status under this section *shall not be detained* by the Attorney General on the basis of the alien's immigration status in the United States."[8] 8 U.S.C. § 1254a(d)(4) (emphasis added). It is hard to imagine a clearer statutory mandate proscribing detention.

58. Further, 8 C.F.R. § 244.14(b)(3) provides that when the basis for TPS withdrawal does not constitute "a ground of deportability or excludability which renders an alien ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c)" then the noncitizen "shall be given written notice of his or her right to appeal to the AAU," and, significantly, "Temporary Protected Status benefits will be extended during the pendency of an appeal."

59. Here, the basis for the TPS withdrawal is that USCIS claims that Mr. and Ms. Sanchez are "a danger to the security of the United States under INA 208(b)(2)(A)(iv) [8 U.S.C. § 1158(b)(2)(A)(iv)]," rendering them ineligible for TPS under 8 C.F.R. § 244.4(b). Dkt. 1-1.

---

[8] "Attorney General" in Section 1254a now refers to the Secretary of the Department of Homeland Security. *See* 8 U.S.C. §1103; 6 U.S.C. § 557.

This claim is based on spurious allegations that Mr. and Ms. Sanchez are associated with the Tren de Aragua (TdA) criminal organization, allegations which Judge Brinkema wholly discredited, questioning their reliability and veracity. *See* Dkt. 1-8 at 4–7. At the March 28 hearing, Judge Brinkema discussed the probable cause standard, first asking whether the Government could "actually stand before this Court and tell [this Court] that there is any genuine evidence of either of these two people posing any kind of threat to national security?" *Id.* at 4–5. When the Government tried to argue that Ms. Sanchez is "an admitted affiliate of the gang," the Court explained that Government's only evidence is a declaration full of improper "editorializing," "assumptions and putting words in people's mouths. You don't have it here." *Id.* at 7. The Court then stated that if this were the affidavit accompanying a criminal arrest warrant, the Court would "throw you out of [its] chambers." *Id.* at 7.

60.    That basis—already thoroughly discredited by another U.S. District Judge—does not constitute a ground of deportability or excludability, nor does it render Mr. and Ms. Sanchez inadmissible under 8 C.F.R. § 244.3(c), which the Government has already conceded. *See* Dkt. 1-9 ("Because withdrawal of Petitioners' TPS status was not on a removability ground, they retain their TPS status pending administrative appeal pursuant to 8 C.F.R. 244.14(b)(3)."). Pursuant to 8 C.F.R. § 244.14(b)(3), Mr. and Ms. Sanchez were given notices of their right to appeal, which gave them thirty-three (33) days to appeal, through May 4, 2025. Dkt. 1-1. They were arrested and detained by ICE on April 16, 2025, which is well within this thirty-three-day appeal period.

61.    Mr. and Ms. Sanchez have every intention of appealing DHS TPS withdrawal decisions and have recently secured counsel from the immigration firm of Grossman Young & Hammond in Maryland to do so. The government represented agreement in writing that

"Petitioners would maintain their TPS designation until any administrative appeals of the withdrawal are resolved." Dkt. 1-9, April 1, 2025 Email from AUSA Matthew Mezger.

62.     Importantly, 8 C.F.R. § 244.14(b)(3) provides that "Temporary Protected Status benefits will be extended during the pendency of an appeal." One of those benefits is the statutory prohibition on detention of TPS holders. *See* 8 U.S.C. § 1254a(d)(4). Therefore, because the appeal period had not elapsed, Mr. and Ms. Sanchez were still protected from detention by that statutory bar when they were arrested and detained by ICE on April 16, 2025, making their initial detention on or around 9am MT unlawful.

63.     Subsequently, approximately four and a half hours after the initial detention, and at the same time that Respondents were interrogating Mr. and Ms. Sanchez without counsel present, Respondents invoked the Alien Enemies Act and shifted the basis for their detention to an Alien Enemies Act designation.

64.     However, that designation is based solely on allegations of membership with Tren de Aragua which, as previously noted, are entirely baseless, unsubstantiated, and insufficient. *See* Dkt. 1-8 Tr. of March 28, 2025 Hr'g at 4–7. It does not meet or even approach adequate evidence of TdA membership.

65.     The designation of Mr. and Ms. Sanchez as alien enemies is unlawful for that reason alone.

66.     Accordingly, this Court should find that Mr. and Ms. Sanchez were improperly and unlawfully designated as alien enemies and may not be designated as alien enemies. Without such a finding, Mr. and Ms. Sanchez are at risk of repeated harassment, re-detention, disappearance to a foreign country, and permanent separation from their children, the youngest of whom is just four years old.

67.    With that finding, this Court should grant the writ, ordering Mr. and Ms. Sanchez's immediate release, and prohibit any re-detention without notice to this Court and a full hearing on the merits of their detention. *See* 28 U.S.C. § 2241(c)(3) (authorizing writ for people detained in violation of federal law).

68.    For all the reasons stated above, Mr. and Ms. Sanchez's detention violates the Due Process Clause of the Fifth Amendment. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause [of the Fifth Amendment] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

69.    Mr. and Ms. Sanchez's initial re-detention on April 16, 2025 violates the Fifth Amendment's protection of liberty because they are not "deportable" insofar as the TPS statute bars their deportation, *see Reno v. Flores*, 507 U.S. 292, 301–02 (1993), federal law explicitly prohibits the detention of TPS holders, *Zadvydas*, 533 U.S. at 718 (Kennedy, J., dissenting) ("[T]he Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention."), and their detention does not "bear[] a reasonable relation to the purpose for which the individual was committed." *Demore v. Kim*, 538 U.S. 510, 527 (2003) (citing *Zadvydas*, 533 U.S. at 690). Where, as here, the government had no authority to detain or deport Mr. and Ms. Sanchez, their initial detention was not reasonably related to its purpose.

70.    As Respondents never had a valid basis for designating Mr. and Ms. Sanchez as alien enemies due to the lack of evidence that both Mr. and Ms. Sanchez are TdA members, their continued detention and potential removal continues to violate the Fifth Amendment. *J.G.G.*, 2025 WL 1024097, *2 (Supreme Court holding, in the context of the AEA invocation, that

noncitizens detained pursuant to that invocation are "entitle[d]" to the Fifth Amendment's due process guarantee (citing *Flores*, 507 U.S. at 306)); *see also Zadvydas*, 533 U.S. at 690.

71.     If successful to their challenge on the alien enemy designation, Mr. and Ms. Sanchez and this Court need not reach the issue that the Proclamation's invocation of the Alien Enemies Act is unlawful as there is no "invasion" or "predatory incursion" upon the United States, the purported invasion is not by a "foreign nation or government."[9]

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF:**
**VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT – 8 U.S.C. § 1254a**

72.     Mr. and Ms. Sanchez reallege and incorporate by reference each and every allegation contained above.

73.     Section 1254a of Title 8 of the U.S. Code governs the treatment of TPS holders, including their detention and removal under federal immigration law.

74.     Section 1254a(d)(4) states "[a]n alien provided temporary protected status under this section *shall not be detained* by the Attorney General on the basis of the alien's immigration status in the United States." (emphasis added).

---

[9] Should it become necessary, Mr. and Ms. Sanchez intend to argue that because the federal government has designated TdA as a foreign terrorist organization pursuant to 8 U.S.C. § 1189, the statutes governing detention and removal of TdA members are those enacted by the same Congress that enacted Section 1189 itself. *See generally* 8 U.S.C. § 1531, et seq. (establishing Alien Terrorist Removal Court (ATRC)). In the years since, Congress has supplemented that authority in several respects, including in the USA PATRIOT Act, *see, e.g.*, 8 U.S.C. § 1226(c)(1)(D); 8 U.S.C. § 1226a; but it has done so within Title 8, which remains the "sole and exclusive" source of authority for the detention and removal of non-citizens from the United States. *See* ECF 1, at 5 (citing 8 U.S.C. § 1229a(a)(3)). In contrast, the AEA does not apply here because, *inter alia*, TdA is not a "foreign nation or government" and it has not perpetrated or threatened "an invasion or predatory incursion" into the United States. Moreover, the United States has not declared war on either Venezuela or TdA. While TdA members have engaged in some (disputed) amount of criminal activity in this country, such activity has never been a sufficient basis for summary detention and deportation under military authorities. Mr. and Ms. Sanchez are prepared to brief these issues should it prove necessary, if the petition is not resolved on the alien enemies designation grounds.

75.    Further, 8 C.F.R. § 244.14(b)(3) provides that "Temporary Protected Status benefits will be extended during the pendency of an appeal." Such benefits include the statutory prohibition on detention.

76.    Although Petitioners' TPS was withdrawn on April 1, 2025, they were given thirty-three days to appeal, until May 4, 2025. *See* Dkt. 1-1. Mr. and Ms. Sanchez are still well within the time period to file an appeal and have recently secured counsel to prepare that appeal.

77.    There is no exception to this rule provided in the statute or the regulations.

78.    Thus, Mr. and Ms. Sanchez's detention violates 8 U.S.C. § 1254a and 8 C.F.R. § 244.14(b)(3), and they are entitled to immediate release from custody.

**SECOND CLAIM FOR RELIEF:**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (APA)**

79.    Mr. and Ms. Sanchez reallege and incorporate by reference each and every allegation contained above.

80.    Under § 706(a) of the APA, final agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

81.    Respondents designated Mr. and Ms. Sanchez as alien enemies under the AEA. Those designations constitute final agency action.

82.    The facts alleged do not form an adequate basis for Mr. and Ms. Sanchez's designations as alien enemies under the AEA.

83.    Respondents' designations of Mr. and Ms. Sanchez as alien enemies under the AEA are therefore arbitrary and capricious or otherwise not in accordance with law, in violation of the APA.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION

84. Mr. and Ms. Sanchez reallege and incorporate by reference each and every allegation contained above.

85. The Due Process Clause of the Fifth Amendment forbids the government from depriving any person of liberty without due process of law. U.S. Const. amend. V. *See generally Reno v. Flores*, 507 U.S. 292 (1993); *Zadvydas v. Davis*, 533 U.S. 678 (2001); *Demore v. Kim*, 538 U.S. 510 (2003).

86. Mr. and Ms. Sanchez's initial re-detention violates the Due Process Clause because it is not rationally related to any immigration purpose; because it is not the least restrictive mechanism for accomplishing any legitimate purpose the government could have in imprisoning Petitioner; and because it lacks any statutory authorization.

87. Mr. and Ms. Sanchez's ongoing detention pursuant to the AEA violates the Due Process Clause because they have not been provided with notice of all of the actual evidence against them; an opportunity to rebut that evidence through cross-examination of any witnesses the government has relied upon and may present; an opportunity to present their own evidence and call and examine witnesses; and some opportunity for discovery.

88. In denying Mr. and Ms. Sanchez meaningful procedural protections to challenge their removal, the Proclamation violates due process.

89. Their designation further violates due process because it lacks a factual basis.

90. Thus, Mr. and Ms. Sanchez's detention violates the Due Process Clause of the Fifth Amendment, and they are entitled to immediate release from custody.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray that this Court grant the following relief:

1.  Assume jurisdiction over this matter;

2.  Order Respondents to show cause why the writ should not be granted within three days, set a hearing on this Petition within five days of the return, as required by 28 U.S.C. § 2243, and order Respondents not to transfer or remove Petitioners from this District while this Petition is pending;[10]

3.  Declare that Petitioners' detention violates the Immigration and Nationality Act and its implementing regulations, and specifically 8 U.S.C. § 1254a and 8 C.F.R. § 244.14(b)(3);

4.  Declare that Petitioners' detention violates the Due Process Clause of the Fifth Amendment;

5.  Order that Respondents shall not transfer Petitioners or remove them from the District until this habeas petition is adjudicated;

6.  Grant a writ of habeas corpus ordering Respondents to immediately release Petitioners from custody;

7.  Enjoin Respondents from further detaining Petitioners so long as TPS for Venezuela remains in effect and Petitioners continue to hold TPS status under the law;

8.  Declare that Respondents' allegations are insufficient to warrant an alien enemy designation, and enjoin Respondents from detaining or re-detaining Petitioners on this basis;

---

[10] This prayer for relief has already been satisfied with the issuance of the Court's Temporary Restraining Order, Dkt. 3, Scheduling Order, Dkt. 4,and Order Setting Hearing, Dkt. 5.

9.  Order that if Respondents attempt to re-detain Petitioners on the basis of immigration status or the AEA, Respondents must first provide undersigned counsel with a 30-day notice and an opportunity to respond.

10. Award reasonable attorney's fees and costs pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

11. Grant such further relief as this Court deems just and proper.


Dated: April 18, 2025                                        Respectfully submitted,


                                        BENOIT LEGAL, P.L.L.C.
                                        311 Montana Ave, Suite B
                                        El Paso, Texas 79902
                                        (915)532-5544
                                        (915) 532-5566 Fax

                                        /s/ *Christopher Benoit*
                                        CHRISTOPHER BENOIT
                                        Texas Bar No. 24068653
                                        chris@coylefirm.com

                                        /S/ *Sherilyn A. Bunn*
                                        Sherilyn A. Bunn
                                        Attorney at Law
                                        Texas Bar No. 24081710
                                        FIRTH BUNN KERR NEILL
                                        311 Montana Law Center
                                        El Paso, Texas 79902
                                        Tel. #: (915) 532-7500
                                        Fax #: (915)532-7503


                                        Yulie Landan*
                                        Sirine Shebaya*
                                        Matthew S. Vogel*†
                                        National Immigration Project
                                        of the National Lawyers Guild
                                        1763 Columbia Road NW
                                        Suite 175 # 896645

Washington, DC 20009
Tel: (213) 430-5521
yulie@nipnlg.org
sirine@nipnlg.org
matt@nipnlg.org

*Pro hac vice* application pending

†Not admitted in TX; working remotely from and admitted in Louisiana only.

**COUNSEL FOR PETITIONERS**

## <u>VERIFICATION PURUSANT TO 28 U.S.C. § 2242</u>

I am submitting this verification on behalf of Petitioners because I am one of the

Petitioners' attorneys. I have discussed with the Petitioners' legal team the events described

in this Petition. On the basis of those discussions, on information and belief, I hereby verify

that the factual statements made in the attached Verified Petition for Writ of Habeas Corpus

are true and correct to the best of my knowledge.


<u>/s/ *Matthew S. Vogel*</u>                                         Date: April 18, 2025

National Immigration Project of the
National Lawyers Guild
1763 Columbia Road NW
Suite 175 # 896645
Washington, DC 20009
Tel: (504) 569-5650
matt@nipnlg.org

## <u>CERTIFICATE OF SERVICE</u>

     I, the undersigned, hereby certify that on this date, I uploaded the foregoing, with all attachments thereto, to this court's CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all case participants. Counsel is also sending a courtesy copy to Respondents' counsel.

Respectfully submitted,                Date: April 18, 2025

                                /s/ *Christopher Benoit*
                                CHRISTOPHER BENOIT