IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **JULIO CESAR SANCHEZ PUENTES** | § | |
| **and LUDDIS NORELIA SANCHEZ** | § | |
| **GARCIA,** | § | |
| **Petitioners,** | § | |
| | § | **EP-25-CV-00127-DB** |
| **v.** | § | |
| | § | |
| **ANGEL GARITE, MARY DE-ANDA-** | § | |
| **YBARRA, TODD LYON, KRISTI** | § | |
| **NOEM, and PAM BONDI,** | § | |
| **Respondents.** | § | |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Petitioners' Julio Cesar Sanchez Puentes ("Petitioner

Sanchez Puentes") and Luddis Norelia Sanchez Garcia's ("Petitioner Sanchez Garcia")

(collectively "Petitioners") "Verified Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C.

§ 2241 and Request for Order to Show Cause," ("Original Habeas Petition"), filed on April 16,

2025, ECF No. 1[1], as well as Petitioners' "Amended Verified Petition for a Writ of Habeas Corpus

Pursuant to 28 U.S.C. § 2241 and Request for Order to Show Cause," ("Amended Habeas

Petition") filed on April 18, 2025, ECF No. 9. As a threshold matter, this Court will not decide

whether President Donald J. Trump lawfully enacted the "Invocation of the Alien Enemies Act

Regarding the Invasion of the United States by Tren de Aragua" ("TdA Proclamation"), (Pres.

Proc. No. 10903, 90 FR 13033, 2025 WL 857554 (Pres.), Proclamation 10903. For purposes of

reaching whether Petitioners are being lawfully detained, this Court will address the adequacy and

---

[1] "ECF No." refers to the Electronic Case Filing ("ECF") number for documents docketed in this
matter. When a discrepancy exists between page numbers on filed documents and page numbers
assigned by the ECF system, the Court will use the page numbers assigned by the ECF system.

sufficiency of the evidence Respondents Angel Garite, Mary De-Anda-Ybarra, Todd Lyons, Kristi

Noem, and Pam Bondi ("Respondents") have presented that Petitioners are in fact members of

Tren de Aragua within the meaning of the TdA Proclamation. This Court's decision not to rule

whether the TdA Proclamation was lawfully enacted, however, should not be construed as tacit

agreement.[2]

While the Amended Habeas Petition is the controlling document here, this Court will also

consider the Original Habeas Petition in part because the Court granted the Petitioners' request for

an emergency Temporary Restraining Order ("TRO") pursuant to the Original Habeas Petition[3].

*See* Original Habeas Pet. 15—16, ECF No. 1; *see also* Order Granting Petitioners' Emergency

Motion for Temporary Restraining Order 1—2, ECF No. 3. The Amended Habeas Petition became

the controlling document on April 18, 2025, when it was served upon Respondents. *See* Certificate

of Service, Am. Habeas Pet. 27, ECF No. 9; *see also Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d

594, 601 (5th Cir. 1981) (holding that "[a]n amended complaint supersedes an original

complaint."). In their Amended Habeas Petition, Petitioners pray this Court:

> 1. Assume jurisdiction over this matter; 2. Order Respondents to
> show cause why the writ should not be granted within three days,
> set a hearing on this Petition within five days of the return, as
> required by 28 U.S.C. § 2243, and order Respondents not to transfer
> or remove Petitioners from this District while this Petition is
> pending; 3. Declare that Petitioners' detention violates the
> Immigration and Nationality Act and its implementing regulations,
> and specifically 8 U.S.C. § 1254a and 8 C.F.R. § 244.141(b)(3); 4.

---

[2] This Court was presented with an emergency petition for an imminent removal of two individuals
who had previously been arrested by ICE and ordered released through a writ in the Eastern District
of Virginia. Due to exigency of Petitioners' induvial proceedings, this Court will not delve into
the questionable constitutionality and validity of the TdA Proclamation.

[3] This Court will also cite to pertinent exhibits attached to Petitioners Original Habeas Petition.

Declare that Petitioners' detention violates the Due Process Clause of the Fifth Amendment; 5. Order that Respondents shall not transfer Petitioners or remove them from the District until this habeas petition is adjudicated; Grant a writ of habeas corpus ordering Respondents to immediately release Petitioners from custody; Enjoin Respondents from further detaining Petitioners so long as TPS for Venezuela remains in effect and Petitioners continue to hold TPS status under the law; 8. Declare that Respondents' allegations are insufficient to warrant an alien enemy designation, and enjoin Respondents from detaining or re-detaining Petitioners on this basis; 9. Order that if Respondents attempt to re-detain Petitioners on the basis of immigration status or the AEA, Respondents must first provide undersigned counsel with a 30-day notice and an opportunity to respond; 10. Award reasonable attorney's fees and costs pursuant to the Equal Access to justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and 11. Grant such further relief as this Court deems just and proper.

Am. Habeas Pet. 23—24, ECF No. 9.

After due consideration, this Court finds the following: (1) this Court has jurisdiction over the instant matter; (2) Respondents' allegations are insufficient to warrant an alien enemy designation for Petitioners, and therefore Respondents are enjoined from detaining or re-detaining Petitioners on this basis; and (3) Petitioners' petition for a writ of habeas corpus is granted; and (4) Respondents must immediately release Petitioners from custody on this basis.

## **BACKGROUND AND PROCEDURAL HISTORY**

Petitioners, both Venezuelan nationals, entered the United States on or about October 13, 2022, in El Paso, Texas, where they were initially detained by immigration officials. Original Habeas Pet. 7, ECF No. 1; Ex. 2, Original Pet. Habeas, ECF No. 1-2. At the time of their entry, Petitioners were arrested and charged with violating 8 U.S.C. § 1325(a)(1), accused of being aliens to the United States, and knowingly entering or attempting to enter the United States at a place

3

other than an official port of entry as designated by immigration officers. *See* Criminal Complaint; *U.S. v. Luddis Norelia Sanchez-Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025); *see also* Criminal Complaint; *U.S. v. Julio Cesar Sanchez-Puentes*, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025). On October 14, 2022, after their arrest and brief detention, Petitioners were paroled into the United States by the United States Department of Homeland Security. Ex. 2, Original Pet. Habeas, ECF No. 1-2. Petitioners moved to and have lived in both Washington D.C. and Maryland from the time of their release to present day. *See* Original Habeas Pet. 7, ECF No. 1. As of the time immediately preceding their most recent arrest and confinement, Petitioners were living in Washington, D.C. with their three children. *Id.* While living in the United States, Petitioners applied for, and were granted, Temporary Protected Status ("TPS"), a program offered by the Department of Homeland Security ("DHS") and U.S. Citizenship and Immigration Services ("USCIS").

A. Brief History Regarding Temporary Protected Status for Venezuelan Nationals

Because Petitioners' TPS status is relevant to this case, this Court will briefly recount the history of TPS for Venezuelan nationals, and the recent decisions surrounding it. On January 19, 2021, then-President Donald Trump directed the Secretaries of State and Homeland Security to "take appropriate measures to defer for 18 months the removal of any national of Venezuela . . . who is present in the United States as of January 20, 2021," with limited exceptions. Mem. on Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845 (Jan. 19, 2021). This policy ("2021 TPS Designation") was enacted because of "[a] catastrophic economic crisis and shortage[] of basic goods and medicine" which had "forced about five million Venezuelans to flee

[Venezuela], often under dangerous conditions." *Id.* This policy allowed for "the deferral of the removal of Venezuelan nationals who are present in the United States." *Id.* The TPS statute unequivocally stated "[a] [non-citizen] provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States." 8 U.S.C. § 1254a(d)(4).

Certain Venezuelan nationals were ineligible for this protection. Individuals who were "inadmissible under section 212(a)(3) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(a)(3)) or removable under section 237(a)(4) of the INA (8 U.S.C. 1227(a)(4))" were not eligible for such relief, and neither were individuals "whose presence in the United States the Secretary of Homeland Security has determined is not in the interest of the United States or presents a danger to public safety" or " whose presence in the United States the Secretary of State has reasonable grounds to believe would have potentially serious adverse foreign policy consequences for the United States." Mem. on Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6845 (Jan. 19, 2021).

The 2021 TPS Designation was extended and broadened at least twice after its initial enaction. The 2021 TPS Designation was first extended for 18 months on September 8, 2022 through March 10, 2024, and was once again extended from March 11, 2024 through September 10, 2025. Am. Habeas Pet. 6–7, ECF No. 9 (citing to 87 Fed. Reg. 55024). On October 3, 2023, the designation was extended for a second time ("2023 TPS Redesignation") for another 18 months and was set to expire on September 10, 2025. *Id.* The 2023 TPS Redesignation also broadened the policy by "allowing individuals who had come to the United States after March 2021 to become

eligible for TPS." *Id.* (citing to 88 Fed. Reg. 68130). The 2023 TPS Redesignation was extended from October 3, 2023 through April 2, 2025, and was most recently extended by DHS by 18 months, through October 2, 2026." *Id.* Similar to the original policy justifications in 2021, in January 2025, the DHS Secretary found that "Venezuela is experiencing a complex, serious and multidimensional humanitarian crisis" which has "disrupted every aspect of life in Venezuela." *Id.* (internal citation omitted).

B. Petitioners' TPS Status under the 2023 TPS Redesignation

Pursuant to the various extensions and expansions of TPS for Venezuelans, Petitioners applied for and were granted TPS under the 2023 TPS Redesignation. Petitioner Sanchez Garcia applied for TPS in March 2024, and was approved in May 2024. Ex. 3, Original Habeas Pet., ECF No. 1-3. Petitioner Sanchez Puentes applied for TPS in February 2024, was approved in June 2024, *see* Ex. 1, Original Habeas Pet., ECF No. 1-1, and was notified of such decision in August 2024. Ex. 3, Original Habeas Pet., ECF No. 1-3. In January 2025, President Donald Trump, through his DHS Secretary, signaled the most recent extension of TPS for Venezuela would be vacated. Am. Habeas Pet. 7, ECF No. 9. The Government formally published this vacated extension in the Federal Register on February 3, 2025. *See* Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025). On February 5, 2025, the Government published its notice to terminate the 2023 TPS Redesignation and officially terminated this status at 11:59 p.m. on April 7, 2025. *See* Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040 (Feb. 5, 2025).

On April 1, 2025, Petitioners each received notices their TPS status had been withdrawn due to Petitioners alleged "association with a Foreign Terrorist Organization," thereby making them ineligible for TPS under the statute.[4] Ex. 1, Original Habeas Pet., ECF No. 1-1. The "Foreign Terrorist Organization" at issue was "Tren de Aragua" ("TdA"), which the Department of State designated as a "Foreign Terrorist Organization" on February 20, 2025. *Id.* This notice also provided for an appeals period, in which Petitioners could "appeal to the Administrative Appeals Office (AAO) by filing a Notice of Appeal or Motion . . . within 33 days of the date of this decision." *Id.* The Court notes that while Petitioners have not yet officially appealed their termination of TPS status, they retained immigration counsel on April 8, 2025 to do so, as well as to represent them in other immigration matters[5]. *See* Decl. of Marcela Maria Villeda Sanchinelli 1, Ex. 1, Am. Habeas Pet., ECF No. 9-1.

C. Petitioners' Multiple Arrests, Detentions, and Releases While Retaining TPS Status

Prior to receiving the notices terminating their TPS status on April 1, 2025, Petitioners were arrested and detained twice, first in federal criminal custody and then in Immigration and Customs Enforcement ("ICE") custody. As previously outlined, Petitioners were arrested when they crossed the border from Mexico into El Paso, Texas on October 13, 2022. Original Habeas Pet. 7, ECF No. 1. On February 27, 2025, more than two years later, the federal government took its initial action in bringing a criminal case by requesting warrants be issued for Petitioners. *See* Arrest Warrant,

[4] Venezuelan nationals are ineligible for TPS under the statute if the Government deems them to be "a danger to the security of the United States under INA 208(b)(2)(A)(iv).

[5] Petitioners applied for asylum and withholding of removal under the Convention Against Torture with USCIS on March 6, 2025 and March 8, 2025, prior to the notice that their TPS was being terminated, and prior to their multiple arrests and detentions. Original Habeas Pet. 8, ECF No. 1.

*U.S. v. Luddis Norelia Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 2; *see also* Arrest Warrant, *U.S. v. Julio Cesar Sanchez Puentes*, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 2.  Petitioners were arrested pursuant to these warrants on March 11, 2025, in Washington D.C.  *See* Executed Arrest Warrant, *U.S. v. Luddis Norelia Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 9; *see also* Executed Arrest Warrant, *U.S. v. Julio Cesar Sanchez Puentes*, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 9.  Petitioners remained detained in the District of Columbia until March 12, 2025, when they were both released from custody by United States Magistrate Judge G. Michael Harvey ("Judge Harvey").  *See* Order Setting Conditions of Release, *U.S. v. Luddis Norelia Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 4; *see also* Order Setting Conditions of Release, *U.S. v. Julio Cesar Sanchez Puentes*, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 4.

Shortly after their release, Petitioners were arrested by federal immigration agents on March 21, 2025. Am. Habeas Pet. 13, ECF No. 9. Petitioners were taken to the Washington, D.C. ICE field office in Chantilly, Virginia. *Id.* At that time, they were processed and both served with Notices to Appear ("NTAs"), which initiated removal proceedings. Notice(s) to Appear, Ex. 6, Original Habeas Pet., ECF No. 1-6. The same day they were arrested by ICE, Petitioners filed a habeas petition in the federal court in the Eastern District of Virginia. *Id.*; *see also* Petition for a Writ of Habeas Corpus, *Puentes, et al. v. Charles, et al.*, 1:25-CV-00509-LMB (E.D. Va. Alexandria Div., Mar. 21, 2025), ECF No. 1. Judge Leonie Brinkema ("Judge Brinkema") held a

hearing[6] on the Petitioners' writ of habeas corpus on March 28, 2025, and ordered their release on

that day. Am. Habeas Pet. 13, ECF No. 9. Two days after Petitioners were released from custody

pursuant to Judge Brinkema's order, on April 1, 2025, the Government represented to Petitioners'

counsel in the Eastern District of Virginia habeas action that:

> Because withdrawal of Petitioners' TPS status was not on a removability ground, they retain their TPS status pending administrative appeal pursuant to 8 C.F.R. 244.14(b)(3). Barring a successful government appeal in National TPS Alliance v. Noem, No. 3:25 CV 01766 (N.D. Cal.), resulting in vacatur of the TPS designation for Venezuela, or any developments bearing on Petitioners' TPS eligibility vis-à-vis their removability, therefore, we agree that Petitioners would maintain their TPS designation until any administrative appeals of the withdrawal are resolved. As for future detention, ICE will abide by Judge Brinkema's ruling that Petitioners may not be detained based on the present circumstances. Should those circumstances materially change, however, ICE may revisit whether detention is appropriate.

Am. Habeas Pet. 14, ECF No. 9; Email from Matthew J. Mezger, Ex. 9, Original Habeas Pet.,

ECF No. 1-9.

After their release in Washington D.C. by Judge Harvey, both Petitioners were set for a

pretrial conference on April 14, 2025 in front of United States Magistrate Judge Anne T. Berton

("Judge Berton") in El Paso, Texas. *See* Order Setting Pretrial Conference, *U.S. v. Luddis Norelia

Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 5; *see

also* Order Setting Pretrial Conference, *U.S. v. Julio Cesar Sanchez Puentes*, EP-25-M-00789-ATB

(W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 5. Petitioners "traveled to El Paso for [their]

pretrial hearing in their misdemeanor criminal case," were represented by attorney Sherilyn Bunn

at the April 14th hearing. Am. Habeas Pet. 14, ECF No. 9. Judge Berton elected to continue

---

[6] The Court will refer to this hearing in greater detail below.

Petitioners' case until June 23, 2025, and allowed Petitioners to remain free on bail. *Id. See also* Docket, *U.S. v. Luddis Norelia Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025); *see also* Docket, U.S. v. Julio Cesar Sanchez Puentes, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025). Judge Berton also set both Petitioners for a hearing to modify their bond conditions on April 16, 2025. *See* Minute Entry, *U.S. v. Luddis Norelia Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 13; Order Setting Bond Status, *U.S. v. Luddis Norelia Sanchez Garcia*, EP-25-M-00788-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 12; Minute Entry, *U.S. v. Julio Cesar Sanchez Puentes*, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 13; Order Setting Bond Status, *U.S. v. Julio Cesar Sanchez Puentes*, EP-25-M-00789-ATB (W.D. Tex. El Paso Div. Feb. 27, 2025), ECF No. 12. Judge Berton released Petitioners from her court on April 16th and allowed them to return to Washington, D.C. *Id.*

D. Brief History Regarding the "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua"

On March 14, 2025, in the TdA Proclamation, President Donald J. Trump invoked the Alien Enemies Act alleging the invasion of the Tren de Aragua criminal organization. Pres. Proc. No. 10903, 90 FR 13033, 2025 WL 857554. The Alien Enemies Act ("AEA") is a wartime authority enacted in 1798 that grants the President of the United States specific powers with respect to the regulation, detention, and deportation of alien enemies. As codified today, the AEA provides that:

> [w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the president makes public proclamation of the event, all

10

> natives, citizens, denizens, or subjects of the hostile nation or
> government, being the age of fourteen years and upward, who shall
> be within the United States and not actually naturalized, shall be
> liable to be apprehended, restrained, secured, and removed as alien
> enemies.

50 U.S.C. § 21.

Before the TdA Proclamation, this wartime power had only been invoked three times in the

nation's history, each during the time of a major conflict specifically the War of 1812, World War

I, and World War II.[7]  Notably, the AEA was "a key authority behind detentions, expulsions, and

restrictions targeting German, Austro-Hungarian, Japanese, and Italian immigrants." *Id.* The AEA

"is best known for its role in Japanese internment" during World War II. *Id.* Although the AEA

had previously only been used in major conflicts, "Presidents Woodrow Wilson and Harry S.

Truman continued using the law after the cessation of hostilities in World Wars I and II." *Id.*

Woodrow Wilson used the AEA after WWI ended "to intern German and Austro-Hungarian

immigrants" until 1920, and Harry S. Truman "used the law for internment and deportations until

1951." *Id.* The Supreme Court previously upheld Truman's use of the AEA. *Id.* It appears that

the AEA has only been invoked previously against nations or nation- states, and not against

organizations *within* those nations or nation-states.[8]

Since President Trump invoked this wartime authority on March 14, 2025, federal courts

around the country, including this Court, have been grappling with how to resolve issues relating

---

[7] Katherine Yon Ebright, *The Alien Enemies Act, Explained*, BRENNAN CENTER FOR JUSTICE, (Oct. 9, 2024), https://www.brennancenter.org/our-work/research-reports/alien-enemies-act-explained, https://perma.cc/4PJ2-Y3XT.

[8] Reply Brief 77—78, J.A.V. et al., v. Donald J. Trump, et al., No. 1:25-CV-00072 (S.D. Tex. Brownsville Div., Apr. 9, 2025) ("[B]y no stretch of the statutory language can TdA be deemed a 'foreign nation or government.'").

to the AEA, and more specifically, the TdA Proclamation. *See, e.g., D.B.U. et al. v. Trump, et al.*, No. 1:25-CV-01163-CNS (D. Colo., Denver Div., Apr. 12, 2025); *J.A.V., et al. v. Trump, et al.*, No. 1:25-CV-00072-FR (S.D. Tex., Brownsville Div. Apr. 9, 2025); *J.G.G. v. Trump*, No. 1:25-CV-00766 (D.D.C., Mar. 15, 2025). On April 7, 2025, the Supreme Court of the United States issued its first decision surrounding the TdA Proclamation in a per curiam opinion, *Trump v. J.G.G.*, 604 U.S. –, 2025 WL 1024097 (2025). The Court determined that "[a]lthough judicial review under the AEA is limited, we have held that an individual subject to detention and removal under that statute is entitled to "judicial review" of the Act, as well as whether he or she "is in fact an alien enemy fourteen years of age or older." *Id.* at 3 (internal citation omitted). The Court established that "detainees are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *Id.*

Most recently, in *A.A.R.P., et al. v. Trump, President of the U.S., et al.*, the Court ordered[9] the Government "not to remove any member of the putative class of detainees [seeking an injunction against their removal under the Alien Enemies Act] from the United States until further order of this Court," 604 U.S. -- (2025) (citing to 28 U.S.C. §1651(a)). As of the time of this writing, this Court is not aware of any decision on the merits of the TdA Proclamation itself, nor the merits of an individual habeas proceeding challenging their designation as alien enemies pursuant to the TdA Proclamation.

E. Petitioners' Arrest and Detainment by ICE agents in the Western District of Texas

---

[9] The Court's order was issued at 1:00 a.m. on Saturday, April 19, 2025.

After leaving their hearing on April 16, 2025, Petitioners were detained by ICE agents at the El Paso International Airport, and taken into custody at the El Paso ICE Processing Center in El Paso, Texas. Am. Habeas Pet. 14, ECF No. 9. Petitioners, while in the Government's custody, "were repeatedly interrogated, pressured to sign documents and to make admissions regarding issues intertwined with both their criminal and immigration cases, but without counsel present, despite the fact that they have retained both immigration counsel and criminal defense counsel." *Id.* Petitioners allege ICE agents told them at the time they were detained the reason for their detention was because their TPS status had been withdrawn, and Petitioners had not yet appealed this withdrawal. *Id.* Attorneys for Petitioners also allege they "were repeatedly contacting Respondents (the Government) to obtain information about Petitioners' situation." *Id.* at 15. On April 16, 2025, at approximately 5:13 p.m. MST, Petitioners, through their attorneys, filed their Original Habeas Petition, seeking release from custody because Petitioners' TPS status made their detention unlawful. *See* Original Habeas Pet., ECF No. 1.

In their Original Habeas Petition, Petitioners requested an emergency TRO, which this Court granted[10] on April 16, 2025, and issued a formal written order for on April 17, 2025. *See* Order Granting Petitioners' Emergency Motion for Temporary Restraining Order, ECF No. 3. Therein, this Court ordered "Respondents and their agents, employees, assigns, and all those acting in concert with them are enjoined from removing Petitioners from [the Western] District [of Texas], including any removal pursuant to the Alien Enemies Act, until this Court orders otherwise." *Id.*

---

[10] Judge Briones orally granted the TRO in the late hours of April 16, 2025, and all parties were notified of this order via email.

at 1—2. This Court also set the matter for a hearing ("April 23, 2025 Habeas Corpus Hearing")
on April 23, 2025 at 3:30pm MST. *See* Order Setting Hr'g on Motion for Order to Show Cause,
ECF No. 5. This Court then provided the parties with an expedited briefing schedule. *See* Order,
ECF No. 4. This Order required Respondents to file any opposition to the Petitioners' Habeas
Petition by April 21, 2025, and required Petitioners to file any reply by April 22, 2025. *Id.*

While in ICE custody in El Paso, Petitioners were allegedly provided with a document in
English, a language that neither of them reads, speaks, or understands, as "notice" of their
designation as "alien enemies." Am. Habeas Pet. 15, ECF No. 9. Petitioners' attorneys were "not
provided with a copy of the notice or with any information about their earliest removal date, despite
repeated requests." *Id.* On April 18, 2025, Petitioners filed their "Amended Verified Petition for
a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Request for Order to Show Cause."
*See* Am. Habeas Pet., ECF No. 9. Petitioners advised they were not aware at the time of the filing
of the Original Habeas Petition at 5:17 p.m. on April 16, 2025 that Petitioners were going to be
designated as "alien enemies" under the Alien Enemies Act, so they amended their original claims
to add claims regarding their designation as "alien enemies" under the Alien Enemies Act.

On April 21, 2025, rather than filing a brief by the deadline, Respondents filed their
"Opposed Emergency Motion to Extend Response Deadline and Reset Hearing," ("Motion to
Extend Time") ECF No. 12. This was filed on the basis that since "Petitioners filed an amended
Petition, adding an additional prayer for relief that addresses adequacy of notice," Respondents
had, curiously, just "discovered that additional notice was required to comply with the latest
Department of Homeland Security Procedures." *Id.* at 1. That same day, Petitioners responded to

14

arguing "any delay is prejudicial to Petitioners, who remain detained and separated from their children" and that "the sole reason provided for the extension of time does not merit three additional days since it is not dispositive to Petitioners' request for release." *See* Opp'n to Resp't Mot. for Extension of Time 1, ECF No. 13. Petitioners alleged "the new notice is identical to the first notice except that it was now read to [Petitioners] in Spanish." *Id.* at 1—2. It is the Court's understanding that the "notice" referenced by the parties in these pleadings is the notice designating Petitioners as "alien enemies."

This Court swiftly denied Respondents' Motion to Extend Time, also on April 21, 2025. *See* Order Denying Resp'ts' Opposed Emergency Mot. to Extend Resp. Deadline and Reset Hr'g, ECF No. 17. As if a harbinger of things to come, this Court wrote:

> To date, Respondents have not provided this Court with a single reason as to why Petitioners have been designated as Alien Enemies. To date, Respondents have not provided this Court with a single reason as to whether Petitioners' "circumstances have materially change[d]" which would warrant rearrest and incarceration by ICE. To date, Respondents have not provided the Court with any information that would be materially helpful in determining whether Petitioners are being unlawfully detained in violation of their TPS protections during the appeal period. Respondents have known about the instant habeas petition for at least six days. Respondents could have filed their response, which was due on April 21, 2025, providing the Court with even a reason or two as two (*sic*) why Petitioners' habeas petition should be denied, while also requesting an extension of time, but rather than putting in the slightest bit of effort, Respondents instead just asked for more time. To date, Respondents have not provided the Court with *anything* useful.

*Id.* at 4—5.

On April 23, 2025, this Court allowed Respondents to file their out-of-time "Response to Amended Petition for a Writ of Habeas Corpus" ("Response"), ECF No. 22. Therein, Respondents

declare, without providing this Court with a single piece of meaningful evidence, that "Petitioners are members of Tren de Aragua." Resp. 9, ECF No. 22. Respondents allege "credible evidence sufficient to invoke the AEA indicates Petitioners are Tren de Aragua gang members." *Id.* at 15. Respondents point to a single piece of evidence to support their position: the Declaration of Alfonso Ramirez ("Ramirez Declaration" or "Decl. Ramirez"), Ex. F, ECF No. 22-6. Petitioners filed their Reply the same day. *See* "Petitioners' Reply to Amended Verified Petition for a Writ of Habeas Corpus" ("Reply"), ECF No. 23. Petitioners argue Respondents did not provide any new evidence and based their Response entirely on double and triple hearsay. *See id.* at 2. Petitioners specifically attack the Ramirez Declaration, which is the only piece of evidence Respondents put forth to support their position. *Id.* Petitioners argue the Ramirez Declaration is "based not on first-hand knowledge but on alleged review of documents (that are not provided) and statements (that are not verified), that an unknown year-old investigation Respondents have never previously mentioned, relying on unknown sources they never previously brought forth, identified [Petitioner Sanchez Garcia] as a member of TdA." *Id.* This Court, on April 23, 2025, heard arguments from Petitioners and Respondents, and indicated that it would issue its final ruling by Friday, April 25, 2025. The following order is this Court's final ruling.

## **LEGAL STANDARD**

A. Temporary Protected Status under the INA

The TPS statute unambiguously provides that "[a]n alien provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States."4 8 U.S.C. § 1254a(d)(4). Further, 8 C.F.R. § 244.14(b)(3)

provides that when the basis for TPS withdrawal does not constitute "a ground of deportability or excludability which renders an alien ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c)" then the noncitizen "shall be given written notice of his or her right to appeal to the AAU," and, significantly, "Temporary Protected Status benefits will be extended during the pendency of an appeal." 8 C.F.R. § 244.14(b)(3).

    B.  Habeas Corpus and the Alien Enemies Act under the TdA Proclamation

       Petitioners seek equitable relief against their confinement and removal under the Alien Enemies Act ("AEA"). Rev. Stat. § 4067, 50 U.S.C. § 21. Am. Habeas Pet. 3, ECF No. 9. Petitioners challenge the Government's interpretation of the AEA and assert that they do not fall within the category of removable alien enemies. *Id.* at 18–20, 22. Individual habeas corpus proceedings are the proper vehicle for this type of relief. *Trump v. J.G.G.*, 604 U.S. –, 2025 WL 1024097 (2025) (citing *Ludecke v. Watkins*, 335 U.S. 160, 163–164 (1948). ("[c]hallenges to removal under the AEA. . . must be brought in habeas.") "Regardless of whether the detainees formally request release from confinement, because their claims for relief 'necessarily imply the invalidity' of their confinement and removal under the AEA, their claims fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas." *Id.* (citing *Nance v. Ward*, 597 U.S. 159, 167 (2022) and *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). "For 'core habeas petitions,' 'jurisdiction lies in only one district: the district of confinement.'" *Id.* (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)).

       "Although judicial review under the AEA is limited, [the Supreme Court] ha[s] held that an individual subject to detention and removal under that statute is entitled to 'judicial review' as

to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'" *Id.* at \*2 (citing *Ludecke*, 335 U.S. at 163, 172, n. 17). "It is well established that the Fifth Amendment entitles aliens to due process of law" in the context of removal proceedings. *Reno v. Flores*, 507 U.S. 292, 306 (1993). Detainees under the AEA "are entitled to notice and opportunity to be heard 'appropriate to the nature of the case.'" *Trump v. J.G.G.*, 604 U.S. –, 2025 WL 1024097 at \*2 (2025) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "More specifically, in this context, AEA detainees must receive notice after the date of this order that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.*

Habeas proceedings in a proper venue are currently the sole remedy available to non-citizens designated by the Government as alien enemies under the TdA Proclamation. *Id.* An individual's first and only opportunity to challenge the Government's evidence, designation, and their ultimate removal under the TdA Proclamation is when that individual is before a district court during habeas proceedings. Because of the President's unprecedented peacetime invocation of this wartime power, what constitutes proper notice and the government's burden in these specific habeas proceedings is a novel issue. While the President claims grave national defense concerns in its TdA Proclamation, "[i]t would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967). Longstanding principles of habeas doctrine provide that "the necessary scope of habeas review in part depends upon the rigor of any

earlier proceedings." *Boumediene v. Bush*, 553 U.S. 723, 781 (2008). Where, as here, the Government does not afford individuals any process whatsoever after an initial agency finding and prior to their removal under the TdA Proclamation, the Government is not entitled to any deference during habeas proceedings challenging such designation. It is the reviewing court's duty to ensure an individual's due process rights and that the Government has met its burden. [11]

Due process requirements for the removal of non-citizens are long established under the INA and Supreme Court precedent. There is no doubt that removal, whether through the INA or the AEA, bears the same ultimate and grave consequences. *See Woodby v. Immigr. & Naturalization Serv.*, 385 U.S. 276 (1966) ("The immediate hardship of deportation is often greater than that inflicted by denaturalization, which does not, immediately at least, result in expulsion from our shores. And many resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have become naturalized citizens."). The consequences are arguably *more* severe where removals under the AEA and the TdA Proclamation have been, and could continue to be, to foreign nations to be detained in "one of the most notoriously inhumane and dangerous prisons in the world." *Abrego Garcia v. Noem*, No. 8:25-CV-00951-PX, 2025 WL 1014261 at *1 (D. Md. Apr. 6, 2025) (emphasis added) (finding the federal government "even embrace[s] that reality as part of its well-orchestrated mission to use CECOT as a form of punishment and deterrence where "Defendant Noem announcing while

---

[11]"Faced with repeated claims from detained individuals challenging their designation as alien enemies, courts time and again examined the factual basis for the designation and, where necessary, ordered release if the facts did not show that the detainee was an alien enemy." *J.G.G. v. Trump*, 25-CV-766-JEB, 2025 WL 890401 (D.D.C. Mar. 24, 2025) (collecting cases)

standing in front of caged prisoners at CECOT "if an immigrant commits a crime, this is one of the consequences you could face .... You will be removed and you will be prosecuted.").

This case presents the question of what habeas procedures are constitutionally compelled to review whether a petitioner meets the criteria for removal under the TdA's Proclamation[12], including the factual determination of whether a petitioner is a member of Tren de Aragua.[13] The TdA Proclamation renders Tren de Aragua membership the relevant factual predicate for designation analogous to nationality determinations made under previous invocations of the AEA. Those invocations authorized restrictions on all foreign nationals from enemy nations, just as here the invocation authorizes restrictions on all members of Tren de Aragua. *See Lockington v. Smith*, 15 F. Cas. 758, 758-759 (C.C.D. Pa. 1817) (discussing the War of 1812 proclamation); Proclamation, 40 Stat. 1651 (1917) (World War I); Proclamation: Alien Enemies—Japanese, 6 Fed. Reg. 6,321 (Dec. 10, 1941) (World War II).

While it is true that a petitioner may generally bear the burden of proof in habeas proceedings in other contexts, this is not a typical habeas proceeding. These habeas proceedings encompass the ultimate question of whether removal from the United States is warranted under the AEA and the TdA Proclamation. It is well-established removal proceedings, unless otherwise modified by Congress, require the Government to establish its allegations by "clear, unequivocal, and convincing evidence". *Woodby*, 385 U.S. at 286. Although removal proceedings are not the

---

[12] Without deciding, of course, whether the TdA Proclamation itself is lawful.

[13] Under the TdA Proclamation, the term "alien enemy" is defined to include "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States." TdA Proclamation Sec. 1, 90 Fed. Reg. 13034.

equivalent of a criminal prosecution subject to the highest standards, the Supreme Court made clear "it does not syllogistically follow that a person may be banished from this country upon no higher degree of proof than applies in a negligence case. This Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification." *Id.*   *Woodby*'s directive is clear: "no deportation order may be entered unless it is found by clear, unequivocal, and convincing evidence that the facts alleged as grounds for deportation are true." 385 U.S. at 286.

The same standard applies here. In habeas proceedings for non-citizens designated alien enemies under the TdA Proclamation, the Government, who seeks the detention and removal of an individual under the Alien Enemies Act, bears the burden to show by a "clear, unequivocal, and convincing evidence" that the facts alleged as grounds for deportation are true.  Longstanding due process principles demand it, especially where the Government has not provided any meaningful procedure to safeguard against error.   Evidence by a "clear, unequivocal, and convincing'" standard does not leave the issue in doubt.

Further, the Federal Rules of Evidence apply to these proceedings because they are the default rules in civil proceedings, including habeas, absent an explicit directive otherwise. Fed. R. Evid.1107(b). At the same time, the Supreme Court has recognized "the exigencies of the circumstances may demand that, aside from these core [due process] elements, enemy[] [habeas] proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a

time of ongoing military conflict."[14] *Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004). Even so, the Court reiterated the Government must still set forth "credible evidence that the habeas petitioner meets the" designation criteria and "meaningful support for its conclusion that the detainee is in fact" an alien enemy. *Id.* Whether some hearsay is permitted in these proceedings is not dispositive because even in civil cases where the stakes are lower, the Government's case cannot possibly be based *solely* on hearsay. The Government must still meet its burden to set forth enough credible evidence to rise to the level of "clear, unequivocal, and convincing" evidence of an individual's membership in Tren de Aragua. Allowing the Government to rest its case on presumptions, assumptions, or anything less than what the Court denotes here would render individuals' due process rights meaningless.

## ANALYSIS

Petitioners' raise two arguments in their habeas petition challenging their detention and ongoing confinement in federal immigration custody: (1) although Petitioners' TPS was withdrawn on April 1, 2025, they were given thirty-three days to appeal, until May 4, 2025 and since 8 C.F.R. § 244.14(b)(3) provides that "Temporary Protected Status benefits will be extended during the pendency of an appeal" Petitioners' confinement is unlawful under the INA; and (2) Petitioners' designation as "alien enemies" pursuant to the TdA Proclamation violates due process because it lacks a factual basis, thus making their detention under the AEA unlawful.

A. Jurisdiction

---

[14] This Court does not reach the question of whether the United States of America is actively in an ongoing military conflict.

As a threshold matter, the Court asserts its jurisdiction over this case. Where a noncitizen's arguments "fall within the 'core' of the writ of habeas," "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 604 U.S. ——, No. 29A931, 2025 WL 1024097, at *1 (Apr. 7, 2025) (per curiam) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). Petitioners in this case are detained at the El Paso Service Processing Center in El Paso, Texas within the Western District of Texas. Gov.'s Resp. 7, ECF No. 22. Thus, jurisdiction properly lies within the Western District of Texas and this Court.

### B. Petitioners' Confinement is Unlawful Under the INA

Petitioners' confinement under the INA is unlawful. Section 1254a of Title 8 of the U.S. Code governs the treatment of TPS holders, including their detention and removal under federal immigration law. *See* 8 U.S.C 1254(a). Section 1254a(d)(4) states "[a]n alien provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States." Further, 8 C.F.R. § 244.14(b)(3) provides that "Temporary Protected Status benefits will be extended during the pendency of an appeal." Such benefits include the statutory prohibition on detention. Although Petitioners' TPS was withdrawn on April 1, 2025, they were given thirty-three days to appeal, until May 4, 2025. *See* Original Habeas Pet. 21–24, ECF No. 1. Petitioners are still within the time period to file an appeal and have secured counsel to prepare that appeal. *See* Decl. of Marcela Maria Villeda Sanchinelli 1, Ex. 1, Am. Habeas Pet., ECF No. 9-1. Therefore, Petitioners' detention violates 8 U.S.C. § 1254a and 8 C.F.R. § 244.14(b)(3).

### C. Petitioners' Confinement is Unlawful under the Alien Enemies Act

*1. Respondents have not shown that Petitioner Sanchez Garcia is a TdA member.*

Respondents have not shown that Petitioner Sanchez Garcia is a TdA member, let alone a senior member, by even a "preponderance of the evidence" much less the required "clear, unequivocal, or convincing" evidence standard. Petitioner Sanchez Garcia therefore cannot be designated an "alien enemy" pursuant to the TdA Proclamation and the Alien Enemies Act, and must be released. When Respondents served Petitioner Sanchez Garcia with her "Notice and Warrant of Apprehension and Removal Under the Alien Enemies Act," AEA Notice(s), Ex. 3, Reply, ECF No. 19, Respondents had made an initial determination that Petitioner Sanchez Garcia was a member of TdA, and therefore an "alien enemy" under the TdA Proclamation. The AEA notice stated specifically that "[t]he President has found that Tren de Aragua is perpetrating, attempting, or threatening an invasion or predatory incursion against the territory of the United States, and that Tren de Aragua members are thus Alien Enemies removable under Title 50, United States Code, Section 21." *Id.* Respondents, however, have not shown this Court anything meaningful to substantiate how or why they have designated Petitioner Sanchez Garcia as an "alien enemy."

First, Respondents claim in their Response that on March 10, 2025, when Petitioners were arrested by federal agents in Washington, D.C. pursuant to the arrest warrants from the Western District of Texas, Petitioner Sanchez Garcia admitted membership in TdA. Resp. 4, ECF No. 18. Respondents claim that after being made aware of her rights, Petitioner Sanchez Garcia "stated that she was previously married to Arrevala Rivara and identified him as a member of Tren de Aragua." *Id.* Petitioner Sanchez Garcia then allegedly said "she knows other members of Tren de

24

Aragua" and that "she separated from her ex-husband approximately ten years ago and that her ex-husband was killed by the Venezuelan government due to his affiliation with Tren de Aragua." *Id.* at 4—5.

Second, Respondents attempt to bolster these claims by stating that "credible evidence" exists that indicates Petitioners are TdA gang members. *Id.* at 15. This "credible evidence" takes the form of "law enforcement intelligence." *Id.* More specifically, that "law enforcement intelligence identifies [Petitioner] Sanchez Garcia as a Tren de Aragua member." *Id.* Respondents allege that "as described in a law enforcement document dated August 21, 2024, a protected source who previously worked for the Venezuelan national police and was assigned to a special team targeting Tren de Aragua identified Sanchez Garcia . . . as a Tren de Aragua member." *Id.* Respondents finally point to "a report containing 'highly reliable and verified' information, dated May 15, 2024, Sanchez Garcia is identified by full name, her admitted nickname" and other information, as a Tren de Aragua member. *Id.* Rather than point to various reports, affidavits, or law enforcement documents to substantiate their claims, the single piece of "credible" evidence to which Respondents point is the Ramirez Declaration ("Declaration"). Resp. 46–51, ECF No. 22.

In his declaration, El Paso ICE Assistant Field Office Director Alfonso Ramirez ("AFOD Ramirez") states that "[b]ased on information and documentation obtained, compiled, and reviewed by various law enforcement officials in the regular course of their duties, the United States has determined that Sanchez Garcia is an active TdA member." *Id.* at 49. He states that "[t]he documentation and intelligence on which this determination is based is protected from public disclosure due to tis law enforcement sensitive nature and is summarized" in the

Declaration." *Id.* He goes on to "summarize" all the law enforcement sources and intelligence that identified Petitioner Sanchez Garcia as a TdA member. He cites to a "law enforcement sensitive DHS document dated May 15, 2024," which appears to be a report of some kind, that states the "sourced information is both highly reliable and verified." *Id.* AFOD Ramirez also describes another "law enforcement sensitive document dated August 21, 2024" with information gathered "during a custodial interview with a protected source [that] identified [Petitioner] Sanchez Garcia as a TdA member." *Id.* at 50. The Ramirez Declaration, along with AFOD Ramirez's testimony at this Court's hearing on April 23, 2025, appears to be the only evidence Respondents have put forth in asking this Court to affirm the designation of Petitioner Sanchez Garcia as an alien enemy to justify her continued confinement and ultimate removal from the United States.

Of great concern to this Court is that Respondents contradict themselves throughout the entire record. Respondents claim Petitioner Sanchez Garcia is somehow both a "money receiver and lookout" as well as a "senior member of TdA." For example, AFOD Ramirez writes in his Declaration that Petitioner Sanchez Garcia's "possible role is noted as a money receiver and lookout." Ramirez Decl., Resp. 50, ECF No. 22. However, in a tweet published on April 22, 2025, by the account "ERO El Paso," ERO El Paso tweeted a "Senior member of Tren de Aragua transnational criminal organization in ICE custody: @EROElPaso officers arrested Luddis Norelia Sanchez-Garcia, 33, a Venezuelan national known as "La Licenciada." ERO served her w/removal under the Alien Enemies Act. She is awaiting removal."[15] Yet in his sworn Declaration, AFOD

---

[15] ERO El Paso (@EROElPaso), X (formerly known as Twitter) (Apr. 21, 2025, 7:11 PM), https://x.com/EROElPaso/status/1914487064760082508, https://perma.cc/233B-PKC9.

Ramirez writes that her "possible role is noted as a money receiver and lookout." Ramirez Decl.,

Resp. 50, ECF No. 22.

At this Court's April 23, 2025 Habeas Corpus Hearing, AFOD Ramirez was asked

specifically about the discrepancies and contradictions in the record as they relate to both

Petitioners. At the April 23, 2025 Habeas Corpus Hearing, Petitioners' attorney, Attorney Bunn,

asked AFOD Ramirez about the tweets published by ICE ERO as they relate to this case. The

Rough Transcript[16] generated by the Court includes multiple exchanges between Attorney Bunn

for the Petitioners, and AFOD Ramirez for the Respondents, when discussing Petitioner Sanchez

Garcia's alleged role within TdA.

> Q [Attorney Bunn]: And so this particular person said that Mrs. Sanchez's
> possible role was noted as a money receiver and lookout, correct?
> A [AFOD Ramirez]: That's correct.
> Q: Possible role?
> A: She was a money receiver and lookout.
> Q: Her possible role?
> A: No. She was – she was identified as such.
> Q: Okay. Well, your affidavit sworn under penalty of perjury says her possible
> role is noted as money receiver and lookout?
> A: Uh-huh. She was a lookout and a money receiver.

---

[16] Typically, Courts prefer to use official transcripts when citing to them in a memorandum opinion and order. However, due to the emergency nature of this Memorandum Opinion and Order, this Court will use the "Rough" or "Draft" transcript generated by this Court. At the time of this writing, neither party has requested an official transcript. Further, other courts have addressed this issue of using rough/draft transcripts vs. official transcripts. *See, e.g., United States v. Two Gen. Elec. Aircraft Engines*, No. 14-cv-2213, 2016 WL 6495397, at *1 n.1 (D.D.C. Nov. 2, 2016); *United States v. West*, 21 F.3d 607, 608 (5th Cir. 1994); *G&G Closed Circuit Events, LLC v. La Patrona Seafood & Cantina, LLC*, No. 3:24-cv-156-DCG, 2024 WL 4100243, at *2 n.16 (W.D. Tex. Aug. 28, 2024); *In re St. Clare*, No. NC-13-1507, 2014 WL 4089344, at *3 (9th Cir. Bankr. Aug. 19, 2014).

Rough Transcript of April 23, 2025 Habeas Corpus Hearing 39 (Rough Tr.), *Sanchez Puentes, et al., v. Garite, et al.*, No. 3:25-CV-00127-DB (W.D. Tex. Filed Apr. 16, 2025). Later in the hearing, Attorney Bunn questions AFOD Ramriez as to the tweets published on X by the ERO El Paso account on April 21, 2022.

> Q [Attorney Bunn]: Agent, I'd like to cover with you who made the decision to     publish a tweet on April 22nd for public preview stating that Mr. and Mrs. Sanchez were high-level gang members had been detained.  Was that you and your office?
> A [AFOD Ramirez]: That was our office, yes.

*Id.* at 46.

At Petitioners' previous habeas hearing in the Eastern District of Virginia in front of Judge Brinkema, attorney for the Government, Matthew Mezgher ("Attorney Mezgher"), also contradicted the Government's position when discussing Petitioner Sanchez Garica. *See* Tr. of Writ Hr'g held on March 28, 2025, *Puentes, et al. v. Charles, et al.*, 1:25-CV-00509-LMB (E.D. Va. Alexandria Div., Mar. 21, 2025) at pages 5–6.  Petitioners attached this transcript to their Original Habeas Petition. Transcript, Ex. 8 at 6—7, Original Habeas Pet., ECF No. 1-8.

> Q [Judge Brinkema]: Are you able, as a member of the U.S. Attorney's Office, to  actually stand before this Court and tell me that there is any genuine evidence of either of these  two  people posing any kind of threat to national security?
> A [Attorney Mezgher]: Threat --
> Q: Or to the security of this country?
> A: Well, Your Honor, I understand that, at least as to Ms. Sanchez, she is an admitted member and – well admitted affiliate --
> Q: Whoa, whoa, whoa, whoa.  Be careful.  Has she admitted being a member of   this organization?
> A: Your Honor, I did just misspeak and I was trying to correct myself so forgive me.  She's an admitted affiliate of the gang, Tren de Aragua, TDA, as I'll use it.

> Q: What do you define "an affiliate" as? Is somebody an affiliate because he or she is married to someone who is a member of a gang? Does that automatically make them an affiliate?
> A: Well, the evidence you had asked me about is what I have seen and what I'm representing to the Court is that that is what she has admitted. ICE has separately investigated and they have validated that she is a member.
> Q: The only evidence that you've presented to this Court is this declaration of Erik Weiss. Is he here, by the way?
> A: Your Honor, he is not present in the courtroom.
> Q: All right. And it is the sorriest statement I've ever seen. First of all, it's pure hearsay in the sense that it's not any evidence that he himself, as I understand it, directly has. In other words, he did not interrogate either of these two people and hear this directly. His statement is that it was reported to him that this was done.

*Id.* Later in the hearing, Judge Brinkema goes on to say the following, regarding the conclusory statements the Government made as to Petitioner Sanchez Garcia.

> (As read): "Luddis is a senior member of the TDA." How do you get from somebody who was married possibly 10 years ago to a TDA gang member, marriage, all of a sudden she's a senior member? This is a terrible, terrible affidavit. If this were before me in a criminal case and you were asking to get a warrant issue on this, I'd throw you out of my chambers. No agent should do this type of editorializing, not when people's liberty is at stake. I expect more from the government than this kind of very shoddy work. This is assumptions and putting words in people's mouths
> . . . [Y]ou don't have it. It's not here.

*Id.* at 7. At the hearing with Judge Brinkema, as well as the April 23, 2025 Habeas Corpus hearing in this Court, Respondents and the Government based the entirety of their case on multiple levels of hearsay, hidden within declarations of declarants who have no personal knowledge about the facts they are attesting to. These declarants are not the ones who interviewed Petitioner Sanchez Garcia, and they are not the ones who captured her allegedly incriminating statement on March 10, 2025 in Washington, D.C., and are not the ones who collected "intelligence" and

generated reports that contain "highly reliable and verified" information. Further, these declarants are not the ones who conducted interviews of law enforcement informants who allegedly identified Petitioner Sanchez Garcia as a member of TdA. What is astonishing is that these declarants cannot even so much as identify what government official *did* receive the alleged information directly. Respondents ask this Court to accept their claims, going off of nearly nothing, to substantiate their mammoth claims that Petitioner Sanchez Garcia is a "senior member," or perhaps just a "member," or maybe at the least an "affiliate" of TdA. The Court would not accept this evidence even in a case where only nominal damages were at stake, let alone what is at stake here.

Beyond these shoddy affidavits and contradictory testimony, Respondents haven't provided "membership" at all as it relates to Petitioner Sanchez Garcia. Respondents have not demonstrated to this Court by a "preponderance of the evidence", let alone the required "clear, unequivocal, and convincing" evidence that Petitioner Sanchez Garcia is a member of TdA, nor that she is an "alien enemy" within the meaning of the TdA Proclamation. This Court is in complete agreement with Judge Brinkema's characterization of Respondents' evidence at a previous hearing: "*Respondents don't have it. It's not here.*" For these reasons, this Court is compelled to find that because Respondents have not shown that Petitioner Sanchez Garcia is a TdA member, she cannot be designated an "alien enemy" under the AEA pursuant to the TdA Proclamation, and her continued confinement on these grounds is therefore unlawful. Petitioner Sanchez Garcia must be released.

2. *Respondents have not shown that Petitioner Sanchez Puentes is a TdA member.*

Respondents have not shown that Petitioner Sanchez Puentes is a TdA member, let alone a senior member, by even a "preponderance of the evidence" much less the required "clear,

unequivocal, or convincing" evidence standard. Petitioner Sanchez Puentes therefore cannot be designated an "alien enemy" pursuant to the TdA Proclamation and the Alien Enemies Act and must be released. Like Petitioner Sanchez Garcia's case, Petitioner Sanchez Puentes' case is just as concerning, if not more, based on the admitted lack of any evidence *whatsoever*.

In addition to the tweet regarding Petitioner Sanchez Garcia posted by the ERO El Paso X account on April 22, 2025, the same account posted the following regarding Petitioner Sanchez Puentes: "ICE @EROElPaso officers arrest senior member of Tren de Aragua Transnational Criminal Organization. Julio Cesar Sanchez-Puentes, 27, a Venezuelan national, was served /removal under the Alien Enemies Act & remains in ICE custody awaiting removal. #BorderSecurity."[17] Because the Court already discussed the admission by the ICE ERO El Paso Office that they in fact posted this information online, the Court need not delve into the exchange again. *See* Rough Tr. dialogue *supra* at 27.

In his Declaration, AFOD Ramirez states that "[u]nlike Sanchez Garcia, ICE has not received intelligence confirming that Sanchez Puentes is himself a member of TdA. Because the evidence shows that he is married to, resides with, has children with, and entered the United States unlawfully with Sanchez Garcia, a known TdA member, there is sufficient indicia to have determined that Sanchez Puente (*sic*) is a TdA member." Ramirez Decl., Resp. 51, ECF No. 22. At the April 23, 2025 Habeas Corpus Hearing, AFOD Ramirez once again testified when questioned by Assistant United States Attorney Lacy McAndrew ("Attorney McAndrew") that

---

[17] ERO El Paso (@EROElPaso), X (formerly known as Twitter) (Apr. 21, 2025, 8:30 AM), https://x.com/EROElPaso/status/1914688142302700029, https://perma.cc/7MQD-883Y.

despite there being no intelligence relating to Petitioner Sanchez Puentes, Respondents have still

designated him a "member" of TdA, and therefore an "alien enemy" pursuant to the AEA and TdA

Proclamation.

> Q [Attorney McAndrew]: And then as it relates to – as it relates to
> her husband, can you please explain to the Court from your
> perspective, despite the fact that there is no evidence in that you're
> aware of showing he is for sure a member of this gang, can you
> explain to the Court and why in your professional opinion and based
> on your experience you believe that he is for purposes of this
> proclamation properly designated as a gang member?
> A [AFOD Ramirez]: Yes, ma'am.  One, he is associated with a
> member of the Tren de Aragua. Not only is he associated with a
> member of Tren de Aragua, he also resides with [a] gang member.
> Not only – but for 10 years, so that that is based on my experience
> and my knowledge, this is what led us to believe that he is an
> associate of Tren de Aragua.
> Q: Do you know from the records whether or not he has children
> with the known member of the gang?
> A: Yes.
> Q: And do you know whether the records reflect that he has
> continued to reside with since that unlawful entry with the known
> gang member?
> A: Yes, they resided together.
> Q: Sir, is there any indication in the records from your perspective
> that would have you doubt the fact that this gentleman is properly
> classified as a gang member under this proclamation?
> A: No, ma'am.

See Rough Tr. of April 23, 2025 Habeas Corpus Hearing, *Sanchez Puentes, et al., v. Garite, et al.*,

No. 3:25-CV-00127-DB (W.D. Tex. Filed Apr. 16, 2025) at pages 10–11.

This Court takes clear offense to Respondents wasting judicial resources to admit to the

Court it has no evidence, yet seek to have this Court determine Petitioner Sanchez Puentes is

"guilty by association." This Court found no need to even allow closing arguments as to

Petitioner Sanchez Puentes at the April 23, 2025 Habeas Corpus Hearing.[18]

It is clear as day that Respondents have not demonstrated to this Court by a "preponderance

of the evidence", let alone the required "clear, unequivocal, and convincing" evidence that

Petitioner Sanchez Puentes is a member of TdA, nor that he is an "alien enemy" within the meaning

of the TdA Proclamation. For these reasons, this Court is compelled to find that because

Respondents have not shown that Petitioner Sanchez Puentes is a TdA member, he cannot be

designated an "alien enemy" under the AEA pursuant to the TdA Proclamation, and his continued

confinement on these grounds is therefore unlawful. Petitioner Sanchez Puentes must be released.

   *3. Conclusion*

It is this Court's finding that Respondents' Response and testimony was replete with

conclusions, declarations, and accusations, completely and wholly unsubstantiated by anything

meaningful in the record. Respondents have been unable to convince the Court by even a

preponderance of the evidence, let alone clear, unequivocal, and convincing evidence required,

that Petitioners Sanchez Garcia and Sanchez Puentes are members of Tren de Aragua, and therefore

has not shown this Court that they are properly designated "alien enemies" under the AEA pursuant

the TdA Proclamation. This Court ended its April 23, 2025 Habeas Corpus Hearing with the

following, and it will end this order with the same: "[t]hat's not enough for a court of law . . . Both

---

[18] Prior to closing arguments at the April 23, 2025 Habeas Corpus Hearing that Respondents "don't have anything as to Mr. Sanchez [Puentes]. Nothing." *See* Rough Tr. of April 23, 2025 Habeas Corpus Hearing, *Sanchez Puentes, et al., v. Garite, et al.*, No. 3:25-CV-00127-DB (W.D. Tex. Filed Apr. 16, 2025) at page 64.

Mr. and Mrs. Sanchez are going to be freed.  Let's see what court you're going to go to next." *See* Rough Tr. of April 23, 2025 Habeas Corpus Hearing, *Sanchez Puentes, et al., v. Garite, et al.*, No. 3:25-CV-00127-DB (W.D. Tex. filed Apr. 16, 2025) at page 65.

## CONCLUSION

For the reasons stated above, this Court determines it has jurisdiction over the instant matter and Respondents have not demonstrated they have any lawful basis to continue detaining Petitioners Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia in federal immigration custody. Respondents concede they are not detaining Petitioners under any authority in the Immigration and Nationality Act. Further, Respondents have not set forth sufficient nor adequate evidence that Petitioners are in fact members of Tren de Aragua to warrant an alien enemy designation under the TdA Proclamation.

This Court declines to decide today whether President Trump lawfully invoked the Alien Enemies Act on March 15, 2025 to designate and remove members of the Tren de Aragua criminal organization. Even assuming President Trump's TdA Proclamation is lawful, the Government fails to prove Petitioners' could be properly designated alien enemies under the TdA Proclamation.

Accordingly, **IT IS HEREBY ORDERED** Petitioners' Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia's "Amended Verified Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 and Request for Order to Show Cause," ECF No. 9, is **GRANTED**.

**IT IS FURTHER ORDERED** Petitioners Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia **SHALL BE AND ARE RELEASED** from federal immigration custody, **EFFECTIVE IMMEDIATELY**.

**IT IS FURTHER ORDERED** Respondents Angel Garite, Mary De-Anda-Ybarra, Todd Lyons, Kristi Noem, and Pam Bondi are **ENJOINED** from detaining or re-detaining Petitioners Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia's on the basis of an alien enemy designation pursuant to "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua", Pres. Proc. No. 10903, 90 FR 13033, and therefore both Petitioners **SHALL BE IMMEDIATELY RELEASED** from custody.

**IT IS FURTHER ORDERED** Respondents Angel Garite, Mary De-Anda-Ybarra, Todd Lyons, Kristi Noem, and Pam Bondi are **ENJOINED** from detaining or re-detaining Petitioners Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia's so long as their Temporary Protected States remains valid under law, and therefore both Petitioners **SHALL BE IMMEDIATELY RELEASED** from custody.

**IT IS FURTHER ORDERED** Respondents Angel Garite, Mary De-Anda-Ybarra, Todd Lyons, Kristi Noem, and Pam Bondi **SHALL PROVIDE** undersigned counsel with a thirty (30)-day notice and an opportunity to respond if Respondents attempt to re-detain Petitioners Julio Cesar Sanchez Puentes and Luddis Norelia Sanchez Garcia on the basis of immigration status under the Immigration and Nationality Act or the Alien Enemies Act pursuant to the TdA Proclamation.

## DISTRICT-WIDE ORDER

There is no doubt the Executive Branch's unprecedented peacetime use of wartime power has caused chaos and uncertainty for individual petitioners as well as the judicial branch in how to manage and evaluate the Executive's claims of Tren de Aragua membership, and the invocation of

35

the Alien Enemies Act as a whole. To date, the Supreme Court of the United States has made one mandate clear: AEA detainees *must* be afforded due process. Specifically, "AEA detainees must receive notice . . . that they are subject to removal under the Act. The notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Trump v. J.G.G.*, 604 U.S. –, 2025 WL 1024097 (2025). "[J]urisdiction [for this habeas relief] lies in only one district: the district of confinement." *Id.* (citing *Rumsfeld*, 542 U.S. at 443).

Because of the Executive's unpredictable and inconsistent use of this power[19], and because of due process and jurisdiction considerations, this Court also issues the following order with respect to individuals in custody within the Western District of Texas pursuant to the TdA Proclamation:

**IT IS FINALLY ORDERED** Respondents Angel Garite, Mary De-Anda-Ybarra, Todd Lyons, Kristi Noem, and Pam Bondi, or any agency within the Executive Branch of the United States, or their agents, employees, assigns, and all those acting in concert with them, **SHALL NOT REMOVE FROM THE WESTERN DISTRICT OF TEXAS OR THE UNITED STATES OF**

---

[19] The Executive has deported at least 238 individuals under the TdA Proclamation without any due process at all, and the government has since admitted error in at least one case which it has yet to rectify. *Noem v. Abrego Garcia*, 604 U.S. ---, 2025 WL 1077101, *1 (2025). Further, the Executive has been alleged to seek to remove individuals under this power within 24 hours of giving them notice. *See* Laura Romero, Peter Charalambous, and Luis Martinez, *As administration eyes more AEA deportation flights, judge says he lacks authority to block them*, ABC NEWS (Apr. 18, 2025), https://abcnews.go.com/amp/US/attorneys-venezuelans-warn-clients-imminent-risk-deportation-aea/story?id=120950962, https://perma.cc/6RRZ-SVRN; *see also* Laura Romero, *DOJ giving migrants 'no less than 12 hours' to indicate they intend to contest AEA removal*, ABC NEWS (April 24, 2025), https://abcnews.go.com/US/doj-giving-migrants-12-hours-intend-contest-aea/story?id=121142296, https://perma.cc/3YF4-QXZM.

**AMERICA** any non-citizen detained in, or held, in federal immigration custody in the Western District of Texas who were, are, or will be subject to the March 2025 "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua", Pres. Proc. No. 10903, 90 FR 13033. Respondents **SHALL** provide a twenty-one (21) day notice to individuals detained in the Western District of Texas pursuant to the AEA and the TdA Proclamation. Such notice must include the individual's right to seek judicial review, and inform individuals they may consult an attorney, at their own expense, regarding their detention and the Government's intent to remove them. Such notice must be given and written in a language the individual understands.

    **IT IS SO ORDERED.**

    SIGNED this _25_ day of **April 2025**.

 

**THE HONORABLE DAVID BRIONES**
**SENIOR UNITED STATES DISTRICT JUDGE**